HENRY J. BERNHARDT, ADMINISTRATOR, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT.

272 N. W. 209

FILED MARCH 12, 1937.   No. 29862.

*Beghtol, Foe & Rankin, J. W. Weingarten* and *W. P. Loomis,* for appellant.

*Frank A. Dutton* and *Sanden & Anderson, contra.*

Heard before GOSS, C. J., EBERLY, DAY, PAINE and CARTER, JJ., and ELDRED and CHASE, District Judges.

CHASE, District Judge.

This is an action brought by the administrator of the estate of one George Metzler to recover damages alleged to have resulted from the wrongful death of his intestate while employed by the defendant. The case was submitted to a jury, resulting in a verdict for plaintiff. From the order

overruling a motion for new trial, the defendant presents the record to this court for review. The case is governed by the provisions of the federal statute known as the "Employers' Liability Act."

For convenience the appellee will be designated as plaintiff; the appellant as defendant; and George Metzler, the plaintiff's intestate, as the deceased.

The facts may be summarized as follows: On March 17, 1935, and for sixteen years prior thereto, the deceased had been employed by the defendant. During the seven years immediately preceding his death his employment was designated as car inspector in the switching yards of the defendant at Lincoln, Nebraska. His duties as such were to inspect cars and trains, do light repair work in and about cars and trains arriving and departing from the railroad yards, and sometimes couple air hose and safety chains. About 10 o'clock on the night of March 17, 1935, freight train No. 68 was brought into the defendant's yards at Lincoln. This train consisted of a number of loaded freight cars, most of which originated at Denver, Colorado, and destined to points east of Lincoln, Nebraska. In the section of defendant's switch yards where this accident occurred which resulted in the death of the deceased, there are tracks numbered from 1 to 11; track numbered 1 being on the south and track 11 being on the north of the section, all being connected by a lead track. Immediately adjacent to track 1 is the running track. It was on this track that train No. 68 was brought to a stop. It was there that the deceased and a fellow employee by the name of Stern, in the performance of their duties as car inspectors, passed along the train in search of defective cars, the deceased on the north side and Stern on the south. The deceased discovered that in this train there was a refrigerator car which had a broken brake shoe, a part of which was missing. This was at the east end on the north side of the car. A brake shoe consists of a heavy piece of cast iron weighing about 20 pounds, one surface being concave so that when inserted in the proper position the pressure in the braking

operation will be equally distributed over the convex surface of the wheel. It is held in place by a metal key inserted through a hole in the brake head. The deceased reported the defect to his fellow servant, Stern, and directed him—using the language of the deceased—to "throw me over a shoe and I will put the shoe on." There was a material box a few paces from where Stern was then standing. Upon receiving this command Stern walked to the material box, procured a new shoe, handed it across the track between the cars to the deceased. The deceased, after removing the remaining portion of the broken shoe, undertook to install the new one, but discovered the brake head was so near the surface of the wheel that the shoe could not be forced into place. The deceased suggested that perhaps by pulling the brake rod under the car the beam would recede from the wheel a sufficient distance to permit the repair to be made. Stern advised against the procedure, making the counter suggestion that, since it appeared from the symbol placed upon the car by the yardmaster the car would soon be switched from its present location to track 10 for the purpose of placing it where train No. 68 east would be made up, there would be plenty of time to make the repairs when it came to rest on that track. The deceased then placed the new brake shoe upon the truck bolster of the car. Very shortly the train was cut in two by the switch engine and in pulling out the cut of cars to the west the defective car was taken away in the operation. Stern and the deceased walked across the tracks from track 1 to a point near the material box north of track 11, where they waited for the defective car to arrive, since from the previous information they were aware that the refrigerator car would soon be switched on track 10. After talking there for four or five minutes Stern suggested to the deceased that it would be wise to let the switching crew finish switching before any attempt should be made to make the repair. At this time the men separated. The deceased started east, stating that he would go down and see about the broken shoe. Stern started west to attend to some other matters

and proceeded to track 8. The evidence is not clear as to whether the defective car had been pushed by the point where the men were standing before they separated. Stern testified he believed the deceased must have seen the refrigerator car pass, which provoked the suggestion he would go down and look after the shoe. The switch engine at this time was working up and down the lead track west and south of track 6. Stern and the deceased were only separated about four minutes when Stern noticed the lantern which the deceased had been carrying sitting on the ground on the south side of track 10 between tracks 9 and 10, facing north. Upon discovering this circumstance Stern called to the deceased but got no response. He then started toward the lantern and as he approached he saw blood on the snow inside the south rail of track 10. A moment later he found the body of the deceased under a car wheel about four car-lengths east of where the lantern stood and approximately 150 feet east of these blood spots. During his absence deceased had been run over and killed. When the body was discovered there were five cars on track 10. The car furthest east was an empty which had stood there for some hours. The next car was the defective refrigerator car, then three freight cars loaded with grain. The deceased had been run over by some car in this group. In what manner he was killed, except as indicated from the physical facts, is unknown. His body lay across the south rail of track 10, part on one side and part on the other. He had not inserted the brake shoe in the brake head of the refrigerator car. The new brake shoe that had been previously placed on the bolster was not there and was never discovered afterward. Since they had separated deceased had crossed both track 11 and track 10 and was killed by car wheels running on the south rail of track 10.

The principal ground urged by defendant for reversal is that the evidence is wholly insufficient to support a verdict. Should this question be resolved in favor of the defendant it will sufficiently dispose of the entire case.

The federal employers' liability act, which is admitted

to be applicable to the case, paraphrased, provides that common carriers by railroad, engaging in interstate commerce, shall be liable to any person when employed by such carrier in such commerce, for injury or death arising in whole or in part from the negligence of any of its officers, agents or employees.

It will be observed that recovery under this statute must be predicated upon the negligence of the carrier which in whole or in part was the proximate cause of the plaintiff's damage; and the burden of proving such negligence by a preponderance of the evidence is cast upon the plaintiff.

The theory relied upon by the plaintiff, as gleaned from the pleadings and the evidence, seems to be that the witness Stern was the lead car inspector and consequently the deceased's superior; that Stern, in a conversation had with the deceased at the material box north of track 11, knew the deceased was going to make repairs upon the refrigerator car by inserting the new brake shoe; that Stern told him to go ahead, make said repairs, and he, Stern, would inform the switching crew not to run cars on this track while such repairs were being made; that knowing the deceased was in a position of danger and failing to protect the deceased under such circumstances constituted negligence.

The evidence does not establish such a situation. The only evidence that Stern was the superior must be assumed from his testimony, in which he stated he was lead inspector. If the record shows anything as to the relation these two fellow workmen sustained toward each other it indicates the contrary. It appears that the deceased first discovered the defective brake shoe and directed Stern to procure another from the material box near by and hand it to him and he would put it in place, which Stern did. If either party occupied a position of superiority over the other it was the deceased over Stern since his statement carried with it the element of command. The evidence is undisputed that four minutes before the deceased was found dead Stern had left him at the material box north

of track 11. The only manner in which the repair of the defective car could have been accomplished was for the deceased to pass along the north side of track 10 to a point where the car was standing. The evidence further shows it was unnecessary to go under the car to insert a brake shoe in the brake head, that this operation can be, and usually is, accomplished by standing on the outside of the rails. The physical facts dispute entirely that at the time the deceased met his fatal accident he was engaged in the operation of repairing the defective car. He was killed by car wheels running on the south rail of track 10. Why he was at the time on the south side of track 10 the record is entirely silent. The new brake shoe which he had previously placed upon the bolster of the defective car was gone—the inference being that it must have fallen off somewhere in the switching operation before the car came to rest on track 10. From the place where the deceased was when the accident occurred it was impossible for him to have been engaged in making the needed repairs on the defective car. The evidence also shows that the deceased had been employed by the defendant for sixteen years and had taken an examination on all the safety rules provided by the company in which the dangers of working in switch yards were fully called to his attention. For nearly seven years he had been performing the identical service in which he was engaged at the time of his death. From these facts the inference must be drawn that he was fully acquainted with all the safety rules of the company, among which is a rule that where an attempt is made to make repairs upon defective cars, before such repair is to be made or danger incurred, if in the daytime, a blue flag must be displayed, and if at night, a blue lantern. No such warning light was displayed by deceased.

The witness Stern was called on behalf of plaintiff and testified that when he and the deceased separated at the material box the deceased did not state he was going to replace the broken brake shoe, neither did the witness state to the deceased to go ahead and make the repair, nor that

he would signal the switching crew the danger to which the deceased was then exposed.

Upon this point the plaintiff sought to impeach his own witness, Stern, by the wife of the deceased, and himself, both testifying, over objection of defendant, that the morning following the accident Stern, while at the home of the deceased, told the wife of the deceased that he instructed the deceased to put the brake shoe on; that he would have plenty of time to do so, and that he, Stern, would tell the switching crew not to switch any cars in on that track while such repairs were being made.

The reception of this testimony was strenuously resisted on the part of the defendant. It is quite evident that at this juncture the plaintiff realized he was confronted with a like poverty of material with which to construct a case as were the industrious but disappointed Israelites when they undertook to manufacture bricks without straw. The law will not permit one to bolster up a weak case by supplying the elements of negligence through impeachment of a witness not a party to the case. Such impeaching testimony should never be received without first laying the foundation therefor. The reception of such testimony is based upon surprise or entrapment. In order to lay the foundation the surprise or entrapment should appear. If the party calling the witness had been previously advised that the witness would not testify to such state of facts, then such party cannot claim the benefit of surprise. Such foundational facts should appear before the testimony is admitted. We find no such foundational testimony in the record. While the trial court in its instructions limited the effect and purpose of the receipt of this testimony, yet we entertain grave doubts as to whether the jury comprehended the significance of this instruction. Without treating such as substantive evidence there was nothing upon which to base their verdict; hence, the fact that they found for the plaintiff forces the conclusion they did regard that testimony as substantive evidence, notwithstanding such instruction.

Impeaching testimony on the ground of surprise, when

competent, cannot rise to greater dignity than to permit the jury to determine whether a witness who has made inconsistent statements is worthy of credibility. Had the witness Stern testified that he directed the deceased to make such repairs and he would see that he was protected while so doing, it would have had a direct bearing upon the element of negligence; but when he denied such a state of facts this left the plaintiff wholly without substantive proof on that point. These essential facts could not be supplied by simply calling impeaching witnesses to prove that Stern at another time made such statements. This testimony would have no force as substantive evidence to establish negligence, as it was held in the following cases that such evidence could not be supplied by simply calling impeaching witnesses to prove that Stern at one time made such statements. Such testimony could only be considered for the purpose of contradicting or discrediting Stern as a witness and was in no sense substantive evidence from which it could be inferred that Stern's negligence resulted in the death of the deceased. *Zimmerman v. Kearney County Bank*, 59 Neb. 23, 80 N. W. 54; *Southern Ry. Co. v. Gray*, 241 U. S. 333; *Barrett v. Virginian Ry. Co.*, 244 Fed. 397.

Further, it may be stated that negligence will never be presumed from the fact of injury or death. Negligence, to support a verdict, must be established either by direct proof or by physical facts of sufficient potency from which a reasonable inference of the same may arise. Neither can negligence be based upon surmise, speculation or conjecture.

"A verdict cannot be permitted to stand, which rests upon conjecture, surmise, or speculation, but plaintiff must produce substantial affirmative proof that the negligence of the carrier caused the injury, and 'where proved facts give equal support to each of two inconsistent inferences; in such event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of those inferences as against the other, before he is entitled to recover'"— citing cases. *Wheelock v. Freiwald*, 66 Fed. (2d) 694.

While the record furnishes no information as to the reason why the deceased was upon the south side of track 10 when the fatal accident occurred, however, it is quite certain that he was not there making the repairs upon the defective car. Assuming that he was there in the performance of some service for his employer of a character different from making needed repairs, with the knowledge he had of the rules of the company in which the dangers of his employment are pointed out, he would be held, under the law, to have fully assumed all the risks necessarily incident to the particular service.

In *Seaboard Air Line Co. v. Horton*, 233 U. S. 492, the court said: "Some employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not."

The conclusion we are compelled to draw from the entire record is that the plaintiff utterly failed to assume the burden of proving negligence of the defendant in connection with the death of deceased. The trial court should have sustained the request for a directed verdict, and failure to do so constitutes error. The judgment is reversed and the action dismissed.

REVERSED AND DISMISSED.